UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FELISHA SMITH                                          CIVIL ACTION

VERSUS                                                   NO. 15-4570

GRANT CARRUTH, ET AL.                      SECTION "R" (5)

## ORDER AND REASONS

Defendants Amite City, Amite City Police Department (ACPD) and ACPD Police Chief Jerry Trabona move for summary judgment on plaintiff Felisha Smith's claims under 42 U.S.C. § 1983, and on Smith's related state law claims.[1]  For the following reasons, the Court grants in part, and denies in part, defendants' motion.

## I.    BACKGROUND

This civil case arises out of the alleged kidnapping and rape of plaintiff Felisha Smith.   According to Smith's amended complaint, Smith was kidnapped and raped by defendant Grant Carruth on or around September 20, 2014.[2]  At the time, Carruth was a police officer with ACPD.[3]  According to Smith, she placed an advertisement on an escort services website, and

---

[1]    R. Doc. 40.
[2]    R. Doc. 28 ¶ 10.
[3]    R. Doc. 40-2 at 2 ¶ 3; R. Doc. 40-8 at 56-57.

Carruth responded to the ad at about 12:00 a.m. and invited Smith to his home.[4]  Smith went to the address provided by Carruth, at which point Carruth identified himself as an undercover officer and purported to place Smith under arrest for prostitution.[5]  Instead, Carruth drove Smith to a private wooded area and raped her.[6]  Smith also alleges that on August 11, 2014, Carruth kidnapped and sexually assaulted another victim, known as "A.B."[7]  On December 1, 2016, Carruth was convicted of third-degree rape and kidnapping of Smith by the 21st Judicial District Court for the Parish of Tangipahoa, Louisiana, and was sentenced to 8 years in state prison.[8]

On September 18, 2015, Smith filed this lawsuit,[9] and Smith amended her complaint on May 3, 2016.  Smith alleges that Carruth's acts violated her Fourth and Fourteenth Amendment rights under the Constitution.[10]  Smith further alleges that Trabona is liable in both his individual and official capacities and that Amite City and ACPD are liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), for

---

[4]      R. Doc. 28 at 5 ¶ 15.
[5]      *Id.* ¶ 18.
[6]      *Id.* at 6 ¶ 20.
[7]      *Id.* at 4 ¶ 11.
[8]      Counsel for defendants communicated that Carruth was convicted via fax letter.  R. Doc. 71.
[9]      R. Doc. 1.
[10]      R. Doc. 28 at 9 ¶ 31.

their failure to supervise and train Carruth and otherwise prevent him from raping Smith.[11]  Smith also brings state law negligence claims, and seeks to hold Amite City and Trabona liable for Carruth's torts under a theory of *respondeat superior*.[12]  Smith seeks damages, attorneys' fees, and costs.[13]

Defendants now move for summary judgment, arguing there is no evidence indicating that Trabona or anyone associated with ACPD had any knowledge of Carruth's alleged attack of A.B., and therefore there is no evidence to link Carruth's attack on Smith and the actions of Trabona, ACPD, and Amite City.[14]  Additionally, Chief Trabona argues he is entitled to the defense of qualified immunity.[15]  In support, defendants submit the affidavit of Trabona, as well as deposition testimony of Trabona and Detectives Michael Moore and Dale Athmann of the Tangipahoa Parish Sheriff's Office (TPSO).[16]  Smith filed a response,[17] and defendants replied.[18]  On January 31,

---

[11]  *Id.* ¶ 32.

[12]  *Id.* at 6-7 ¶ 26.  Plaintiff's amended complaint did not name ACPD as a party, as Amite City Police Department is not a juridicial entity separate and distinct from Amite City and is not amenable to suit.  *See Tracie v. Foster*, No. 07-5754, 2008 WL 1834466, at *2 (E.D. La. Apr. 23, 2008).

[13]  *Id.* at 10 ¶ 33.

[14]  R. Doc. 40.

[15]  R. Doc. 40-1 at 6.

[16]  R. Doc. 40-5 (Trabona Affidavit); R. Doc. 40-6 (Moore Deposition); R. Doc. 40-7 (Athmann Deposition); R. Doc. 40-8 (Trabona Deposition).

[17]  R. Doc. 45.

[18]  R. Doc. 51.

2017, Smith filed a sur-reply,[19] and defendants filed a response to Smith's sur-reply.[20]

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

---

[19]    R. Doc. 67.
[20]    R. Doc. 70.

If the dispositive issue is one on which the movant will bear the burden of proof at trial, the movant "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III.   DISCUSSION

Smith's federal claims are brought under 42 U.S.C. § 1983.   Section

1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other
> proper proceeding for redress.

42 U.S.C. § 1983.   The elements of a section 1983 cause of action are: (1) a

deprivation of rights secured by federal law (2) that occurred under color of

state law, and (3) was caused by a state actor.   *See Victoria W. v. Larpenter*,

369 F.3d 475, 482 (5th Cir. 2004).

### A.   Qualified Immunity

Defendants first argue that Chief Trabona is entitled to qualified

immunity.[21]   Qualified immunity shields government agents, sued in their

individual capacities, "from liability for civil damages insofar as their

---

[21]   R. Doc. 40-1 at 6.

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (citation omitted).  The defense of qualified immunity is unavailable in a suit against a state actor in his official capacity, but is available in situations in which a government actor is sued in his individual capacity.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

If a party asserts the defense of absolute or qualified immunity in good faith, the burden shifts to the nonmovant to rebut it.  *Disraeli v. Rotuna*, 489 F.3d 628, 631 (5th Cir. 2007).  To rebut an absolute or qualified immunity defense, the plaintiff may not simply rely on allegations in the pleadings, but must produce competent summary judgment evidence raising a genuine issue of material fact.  *Morales v. Boyd*, 304 F. App'x 315, 318 (5th Cir. 2008). Specifically, the plaintiff must identify facts supporting the conclusion that (1) "the defendant's conduct violated [the plaintiff's] constitutional right" and (2) the "defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (citation omitted). "The very action in question need not previously have been held unlawful for a constitutional violation to be clearly established." *Id.* at 763.  Instead, the "unlawfulness [of the defendant's conduct] must be apparent," and "the

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*  Finally, in deciding this question, the facts alleged must be taken in the light most favorable to the party asserting the injury.  *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004).

As a threshold matter, defendants argue that there was no underlying constitutional violation because Carruth was off-duty and his actions were "purely private."[22]  There is no question, and defendants do not dispute, that rape and kidnapping violate clearly established rights if committed by state actors under color of law.  *See, e.g., Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994) (holding that sexual abuse and violation of bodily integrity clearly violate substantive due process rights under Fourteenth Amendment); *McClendon v. City of Columbia*, 305 F.3d 314, 335-36 (5th Cir. 2002) (same).  Instead, defendants argue Carruth was not acting under color of law.

Defendants are correct that not every action is under color of law simply because the actor is a public official.  *Smith v. Winter*, 782 F.2d 508, 512 (5th Cir. 1986).  However, the definition of "acting under color of state law" in section 1983 actions is broad, and covers situations in which the

---

[22]  R. Doc. 40-1.

defendant possesses power "'by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941).  Other cases have defined "under color of state law" as acting under "pretense of law."  *Screws v. United States*, 325 U.S. 91, 111 (1945).  A defendant in a section 1983 suit "acts under color of state law when he abuses the position given to him by the State."  *West*, 487 U.S. at 50 (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).

Further, this Circuit has long recognized that "whether a police officer is acting under color of law does not depend on duty status at the time of the alleged violation," *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (citation omitted), and officials who act for purely personal reasons do not "necessarily fail to act 'under color of law.'"  *Id.* (quoting *Brown v. Miller*, 631 F.2d 408, 411 (5th Cir. 1980)).

Smith testified that when she encountered Carruth, he flashed his police badge, handcuffed her, *Mirandized* her, and placed her under arrest.[23]  She said Carruth then put her in the back of his vehicle, and threatened her with prostitution charges and jail.[24]  According to Smith, Carruth continued

---

[23]    R. Doc. 45-2 at 3-4; R. Doc. 40-10 at 11.
[24]    *Id.* at 12-13.

to drive with Smith until he reached a secluded area, drew his weapon, and raped her.  Smith's testimony regarding her rape and kidnapping show a violation of clearly established rights that occurred under color of state law. Carruth's behavior resembles the behavior of the defendant-officer in *United States v. Tarpley*.[25]  In *Tarpley*, the Fifth Circuit affirmed the finding that Tarpley acted under color of law when he assaulted a man who had an affair with Tarpley's wife in Tarpley's home.  The *Tarpley* court noted that Tarpley used his service weapon, identified himself as a police officer, claimed to have authority to assault the victim by virtue of being an officer, and that the "air of official authority pervaded the entire incident."  945 F.2d at 809.  As in *Tarpley,* there is evidence that Carruth used his badge and weapon, identified himself as a police officer, threatened to use his authority to arrest, charge, and jail the victim, and used his position of authority to intimidate the victim into compliance.  This is sufficient evidence for a jury to find that Carruth acted under pretense of law, that he took actions possible only because of the power granted to him under state law, and that he abused this authority.  Defendants' threshold argument that there was no constitutional

---

[25]     *Tarpley* was a criminal case and evaluated "under color of law" in the criminal statutes 18 U.S.C. §§ 241 and 242, but the meaning is the same for both criminal and civil statutes, and *Tarpley* cites to civil cases for its definition.  945 F.2d at 808-09.

violation is thus unavailing. Defendants' citation to two out-of-circuit cases with different facts does not alter that conclusion, especially in light of *Tarley.*[26]

That Carruth acted under color of state law does not end the inquiry. Plaintiff not only seeks to hold Carruth liable for his actions, she also seeks to impose liability on Trabona.   Regarding Trabona's claim of qualified immunity, Smith bears the burden to demonstrate that *Trabona's* conduct violated clearly established law. *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992).  Thus, to hold Trabona personally liable, Smith must show not only a violation of her clearly established rights, but also that Trabona's conduct was objectively unreasonable in light of the existence of a clearly established theory of supervisory liability. *See Taylor*, 15 F.3d at 454-456.

Smith's amended complaint asserts two theories of supervisory liability to hold Trabona liable.  Specifically, her complaint alleges that (1) Trabona is liable because he was aware of Carruth's previous attack on A.B. and failed to stop Carruth from attacking Smith, and (2) that Trabona failed

---

[26]     R. Doc. 40-1 at 10 (citing *Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997) (police officer was not acting under color of law when he sexually assaulted minor because he was not on duty, not in uniform, not wearing a badge, and not carrying weapon); *Almand v. DeKalb County*, 103 F.3d 1510, 1514-15 (11th Cir. 1997) (police officer not acting under color of state law when he forcibly broke into woman's apartment and raped her).

to supervise and/or train Carruth.[27]  In terms of the first theory, it is clearly established in this circuit that supervisors of police officers can be liable for the actions of their officers, even if they did not participate in those actions, if the supervisor "knew or should have known that the allegedly unconstitutional acts were occurring and [the supervisor] acquiesced in them." *Wanger v. Bonner*, 621 F.2d 675, 680 (5th Cir. 1980) (upholding jury instruction).

As to plaintiff's allegation that Trabona was aware that Carruth committed the first attack on A.B., Trabona contends that there is no evidence to support that allegation.  Thus he could not have known that the attack on Smith was likely to occur.  The evidence in the record confirms Trabona's position, and there is no genuine dispute of fact as to whether Trabona knew of Carruth's attack on A.B. before Smith was attacked.

According to the Tangipahoa Parish police report, A.B. was attacked on August 11, 2014.[28]  TPSO Detective Moore was assigned to the case.  Moore testified that until Carruth was arrested (after the Smith attack), Moore had not discussed Carruth with anyone from Amite City.[29]  Moore was also clear that ACPD had no involvement with the investigation of Carruth until after

---

[27]   R. Doc. 28 at 4-9.
[28]   R. Doc. 67-1 at 15.
[29]   R. Doc. 40-6 at 87.

Carruth was arrested.[30]  Moore said he had no knowledge that A.B. reported her attack to ACPD or Chief Trabona.[31]  Additionally, he testified that despite Amite City's location in Tangipahoa Parish, TPSO and ACPD are not affiliated in any way.[32]  Moore also testified that to his knowledge, ACPD was not notified via email of a description of a person of interest in the A.B. case.[33]

Detective Dale Athmann of TPSO was the lead detective on the Smith attack.  He testified that his involvement with the A.B. investigation was limited to showing A.B. a photo lineup.[34]  Athmann said he was not aware of the A.B. attack until after Smith was attacked, so that he could not have informed ACPD about Carruth's possible involvement with the A.B. attack before Smith was attacked.[35]  Athmann, like Moore, testified that he did not contact Trabona or anyone else with ACPD regarding Carruth until after Smith was attacked.[36]

Finally, the record contains an affidavit and deposition testimony from Trabona.  Trabona attests that A.B. never reported her attack to him or the ACPD, and that neither Trabona nor anyone else at ACPD (aside from

---

[30]    *Id.* at 55.
[31]    *Id.* at 111-12.
[32]    *Id.* at 113-14.
[33]    *Id.* at 122.  Moore did admit that he was "not certain."  *Id.*
[34]    R. Doc. 40-7 at 10.
[35]    *Id.* at 35.
[36]    *Id.* at 58.

Carruth) had knowledge of the A.B. attack until after Smith was attacked.[37] Further, Trabona testified that he did not know anything about Carruth and either A.B. or Smith until after Carruth was arrested.[38]  In fact, Trabona testified that he called the Sheriff of Tangipahoa Parish to tell him that he did not appreciate being kept in the dark.[39]

For purposes of qualified immunity, this lack of evidence indicates that Smith has not met her burden to show that Trabona knew of Carruth's previous actions and failed to stop him from attacking Smith. At this stage, Smith cannot rest on the allegations in her complaint that Trabona or others within the ACPD knew of Carruth's attack on A.B.  Instead, she must submit evidence indicating there is at least a factual dispute about Trabona's knowledge.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Smith has failed to do so. Therefore, Trabona's conduct was not objectively unreasonable, and Trabona is entitled to qualified immunity against Smith's claims that Trabona knew or should have known that Carruth would attack Smith.

Next, Smith asserts that Trabona is liable for his failure to train or supervise Carruth in a manner that would have prevented Carruth from

---

[37]  R. Doc. 40-5 at 2-3 ¶¶ 6, 11-13.
[38]  R. Doc. 40-8 at 102.
[39]  *Id.*

14

violating her rights. The Fifth Circuit has adopted a three-part test for individual supervisory liability in the context of police officers. *See Taylor*, 15 F.3d at 452. The test requires plaintiffs to show "1) the police chief failed to supervise or train the officer, 2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and 3) such failure to supervise or train amounted to [] deliberate indifference." *Id.* at 452-53 (quotation omitted). Therefore, Smith cannot overcome Trabona's qualified immunity without showing that Trabona's failure to train or supervise was objectively unreasonable in light of the requirement not to be deliberately indifferent to her rights. *See Hare v. City of Conrinth, Miss.*, 135 F.3d 320, 327-28 (5th Cir. 1998) (explaining interaction between qualified immunity's objective unreasonableness standard with failure to train's deliberate indifference standard); *see also Thompson v. Upshur Cty., TX*, 245 F.3d 447, 460 (5th Cir. 2001) (noting that when a defendant moves for summary judgment based on qualified immunity on deliberate indifference claims, plaintiff must show that "all reasonable officials similarly situated would have then known that the [failure to train]" constituted deliberate indifference in violation of the Constitution).

As to the first prong, the evidence on training is that the ACPD had a field officer training policy where the sergeants would take new hires on "ride

alongs" to teach them "what to do out there."[40]  ACPD also had a policy of requiring at least 20 hours yearly of training in subjects including use of force, weapons training, hand-to-hand combat training, first aid, and legal training.[41]  Trabona also testified that he was unclear as to his department's disciplinary policy and that ACPD did not read or explain its policy and procedural manual to its officers.[42]

The existence of ACPD's field officer training policy, the 20 hour requirement, and policy and procedure manual is evidence that ACPD had some training.  Smith contends that this training is insufficient, but points to no specific deficiencies in the training itself.  But even assuming that there were deficiencies in ACPD's training policies, Smith has submitted no evidence that this "failure" was causally connected to the violation of her rights or that the failure to supervise or train amounted to deliberate indifference.  Merely showing that additional training would have been helpful or that the injury "could have been avoided" if the employee had better or more training is insufficient.  *Connick v. Thompson*, 563 U.S. 51, 68 (2011).

---

[40]   R. Doc. 40-8 at 15.
[41]   *Id.* at 42-43.
[42]   *Id.* at 66, 103.

In this context, a showing of deliberate indifference generally requires "a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'"  *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Upshur Cty.*, 245 F.3d at 459) (*Burge II*); *see also Thompson*, 563 U.S. at 62. "A plaintiff must demonstrate at least a pattern of similar violations arising from training or supervising that is so clearly inadequate as to be obviously likely to result in a constitutional violation."  *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008) (internal modifications and quotation omitted).  Further, the plaintiff must demonstrate that the supervisor whose alleged deliberate indifference caused the violation had actual or constructive knowledge of the pattern of similar violations.  *See Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).  And while there is a limited exception for single-incident liability, this exists only "where the facts giving rise to the violation are such that it should have been apparent to the [supervisor] that a constitutional violation was the highly predictable consequence of a particular policy or failure to train."  *Burge II*, 336 F.3d at 373 (citation omitted).

Smith does not offer evidence to support a pattern.  As described above, Trabona was not aware of the first attack on A.B.  There is no evidence of a

complaint from A.B. to Trabona or the ACPD.  Additionally, Trabona testified that Carruth had a clean record before Trabona hired him and that there had been no complaints regarding Carruth between the time he was hired and when Trabona suspended him after his arrest.[43]  Smith has produced no evidence that anyone complained about Carruth's behavior before his attacks, and no evidence that other officers with ACPD committed similar violations.  Thus, Smith has failed to show a "pattern of similar violations" that would give rise to failure to train or supervise liability.

Further, the limited single-incident liability exception does not apply here because there is no evidence that Carruth's attack was the "highly predictable consequence" of his alleged lack of training.[44]  *Brumfield*, 551 F.3d at 329.  Everyone, let alone police officers, should know not to rape, and courts have consistently rejected "obvious" failure to train arguments when common sense dictates that the violation should not require training to avoid.  *See, e.g., Walker v. City of New York*, 974 F.2d 293, 299-300 (2d Cir.

---

[43]   R. Doc. 40-8 at 28, 45.

[44]   The Fifth Circuit described circumstances where it would be appropriate to find failure-to-train liability based on a single incident in *Brown v. Bryan Cty., OK*, 219 F.3d 450 (5th Cir. 2000).  In *Brown*, the court noted that police officers regularly encounter situations in which use of force will be necessary, and therefore it is obvious and highly predictable that a total failure to train officers on use of force will result in excessive force violations.  *Id.* at 462.  Based on this obviousness, the single-incident exception was appropriate.  *Id.*  These circumstances are not present here.

18

1992) (rejecting failure to train not to perjure and prosecute the innocent argument); *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women."); *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior.").  It goes without saying that police officers should not require training or special supervision to know not to rape and kidnap.

Because Smith has not met her burden to show a causal connection between any alleged failure to train or supervise Carruth and the violation of her rights, Trabona is entitled to qualified immunity on Smith's failure to train/supervise claims.  Therefore, as Trabona has qualified immunity as to all of Smith's section 1983 claims against him in his individual capacity, Trabona is entitled summary judgment as to these claims.

## B.    Liability of Amite City and Trabona in his Official Capacity

Smith's suit also seeks to hold Amite City and Trabona (in his official capacity) liable for the actions of Carruth.  A suit against a government officer "in his official capacity" is the same as a suit against the government entity of which he is an agent.  *See Burge v. Parish of St. Tammany*, 187 F.3d at

468 (5th Cir. 1999) (citing *McMillian v. Monroe Cty., Ala.,* 520 U.S. 781, 784-85 (1997)) (*Burge I*).  Therefore, for the purposes of this section the liability of Trabona and the liability of Amite City will be treated as one in the same.

In section 1983 suits, municipalities cannot be held liable under a theory of *respondeat superior*.  *Pineda*, 291 F.3d at 328.  Instead, the Court must apply the *Monell* test, which ensures that municipalities are held responsible *only* for "their *own* illegal acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original).   Section 1983 municipal liability requires proof of three elements: (1) a policymaker, (2) an official policy or custom, and (3) a violation of constitutional rights whose "moving force" is that policy or custom.  *Davis v. Tarrant Cty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (citations omitted).

Thus, a plaintiff seeking to impose liability on a municipality under section 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).  A policy need not itself be unconstitutional to satisfy *Monell*.  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  The Fifth Circuit has identified at least three ways in which plaintiffs may meet their burden to show a policy or custom. *See Burge I*, 187 F.3d at 471.  The first two involve direct action by a "policymaker," either in the form of generally applicable

20

policies or specific, directed actions.  *Id.*  The third involves a failure to act by policymakers when "the need to take some action to control [its agents] 'is so obvious, and the inadequacy of existing practice so likely to result in a violation of constitutional rights, that the policymaker . . . can reasonably be said to be deliberately indifferent to the need.'" *Id.* (quoting *Canton*, 489 U.S. at 390) (internal modifications omitted).

Smith's alleged basis for *Monell* liability is that Trabona and Amite City adopted policies and customs that caused the violation of her rights, and that defendants' failure to train/supervise Carruth evinces deliberate indifference.  Defendants' motion for summary judgment argues that ACPD had no policy or custom that can fairly be called the "moving force" behind the violation of Smith's rights, and that their failure to stop Carruth was not deliberate indifference to a risk that Carruth would violate Smith's rights.[45]

---

[45]      R. Doc. 40-1 at 12-13.  Smith argues in her response that defendants did not move for summary judgment as to her failure to train and "failure of policy" claims.  *See* R. Doc. 45 at 17.  But defendants moved for summary judgment on all of Smith's section 1983 claims, and they point out the lack of evidence establishing any causal link between the actions, policies, or customs of defendants and the violation of Smith's rights.  *See* R. Doc. 40-1 at 12-13.  Therefore, Smith bears the burden of showing a dispute of material fact for all of her section 1983 claims, and cannot simply allege without support that defendants have not moved for summary judgment on all of her claims.  *See Celotex*, 477 U.S. at 322-23.

### 1.  Policies or Customs

As to Smith's first basis for *Monell* liability, Smith identifies two "unwritten" policies or customs that she argues caused the violation of her rights.  First, she points to Trabona's alleged policy of requiring women to come into the police department to file a written complaint against officers and requiring the complainants to sign a form that acknowledges that they can be prosecuted if they are not telling the truth.[46]  Second, she argues Trabona had a custom of allowing his officers to use their badges and handcuffs "to get women."[47]

As to the first policy, Trabona testified that the police department requires certain complaints regarding officer conduct to be made in person.[48] Smith argues that this policy is applied against women in a discriminatory manner and that requiring women to come into the department to report misconduct discourages victims from actually filing complaints.[49]   But Trabona's testimony indicates that this "in-person" complaint policy is not limited to women making complaints.  Although Trabona testified that one reason for this policy is to prevent "a man" from being falsely charged, he

---

[46]   R. Doc. 45 at 12.
[47]   *Id.* at 20.
[48]   R. Doc. 40-8 at 45-47.
[49]   R. Doc. 45 at 19.

also said the policy applies to situations in which a person, male or female, complained about a rude officer who pulled him or her over.[50]

Regardless, even if the policy was as Smith alleges, her argument that it was the moving force behind the violation of her rights is meritless.  The "moving force" analysis requires that "rigorous standards of culpability and causation . . . be applied to ensure that the municipality is not held liable solely for the actions of its employee[s]." *Bryan Cty.*, 520 U.S. at 405; *see also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (holding that moving force inquiry requires showing of causation and culpability).  As to causation, "a plaintiff must show a 'direct causal connection . . . between the policy and the alleged constitutional deprivation.'" *Mason*, 806 F.3d at 280 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)). "The "moving force" inquiry imposes a causation standard higher than "but for" causation." *Id.*  As to culpability, the applicable standard in this context is deliberate indifference, or a showing that the City "promulgated the policy with 'deliberate indifference' to the known or obvious consequences that a constitutional violation would result." *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579).  "Heightened negligence is insufficient to satisfy this standard."  *Id.*

---

[50]      *Id.* at 47-48.

Smith fails on both causation and culpability.  There is no evidence of a direct causal connection between this policy and Carruth's attack.  Smith submits no evidence that this policy actually discouraged complaints or that women would have filed complaints against any officer, much less Carruth, but for this policy.  And there is no evidence suggesting that but for this policy, the attack on Smith would not have occurred.  Smith's argument that this policy "transmits the wrong message to Carruth"[51] falls flat under *Monell*'s causation standard.  There is simply no evidence that this policy was the "moving force" behind the violation of Smith's rights.  *See Lewis v. Pugh*, 289 F. App'x 767, 775-76 (5th Cir. 2008) (rejecting argument that inadequate complaint policy was moving force behind police officer's rape because there was no direct causal link between policy and constitutional violation).

As to culpability, given the lack of evidence indicating a risk of Carruth's behavior, there is no basis to find that defendants adopted this policy with "deliberate indifference to the known or obvious consequences that a constitutional violation would result."  *Mason*, 806 F.3d at 280 (citation omitted).  Without evidence of the risk of Carruth's violating Smith's rights, much less defendants' awareness of said risk, it cannot be said

---

[51]    R. Doc. 45 at 14.

that this policy was adopted deliberately and without regard to that risk. *See Burge II*, 336 F.3d at 371.

The second "policy" argued by Smith can be distilled into an allegation that Trabona acquiesced in his officers' use of their badges and handcuffs to date women and engage in sexual activities with them. Smith points to Trabona's testimony that he tells his officers that their badges "will get [them] in trouble with women," because women are attracted to men in uniform.[52] Trabona also testified that he thinks he remembers telling his officers not to use their handcuffs for "kinky stuff."[53]

As a threshold matter, Trabona's statements do not suggest that ACPD had a policy or custom to allow officers to use their badges or handcuffs in romantic pursuits. Further, Smith submits no evidence that police officers persistently or commonly used their badges and handcuffs in romantic pursuits so that such conduct fairly represents ACPD policy. Unwritten policies or customs will not be considered "official policy" under section 1983 unless they qualify as "persistent, widespread practice . . . , [that] is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.

---

[52]   R. Doc. 40-8 at 106-108.
[53]   *Id.* at 105.

1984) (en banc).  Indeed, other than Carruth's alleged conduct, Smith has not produced evidence that any ACPD officer misused his handcuffs and badge.  "[I]solated violations are not the persistent, often repeated, constant violations that constitute custom and policy."  *Mason*, 806 F.3d at 280 (quotation omitted).

Because Smith cannot show that the policies she complains of were the moving force behind the violation of her rights and were adopted with deliberate indifference, her section 1983 claims for these policies fail.

### 2.    *Failure to Train/Supervise*

Smith's final basis for section 1983 *Monell* liability is that defendants' failure to train and/or supervise caused the violation of her rights.[54]  In limited circumstances, a municipality's failure to train "may rise to the level of an official government policy for purposes of [section] 1983."  *Thompson*, 563 U.S. at 61.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985).  The standard of proof required to establish defendants' failure to train/supervise is the same as required for Trabona's alleged individual failure to train/supervise Carruth.

---

[54]    Smith uses "train" and "supervise" interchangeably and does not flesh out her claims individually as to her attempt to show deliberate indifference.

*See Taylor*, 15 F.3d at 453 ("The Court's reasoning [in *City of Canton v. Harris*] in assessing a municipality's liability [for failure to train/supervise] leads us to use the same standard in assessing an individual supervisor's liability under [section] 1983."); *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).  As above, Smith must show a causal connection between the failure to supervise or train and the violation of her rights, and that such failure to supervise or train amounts to deliberate indifference.  *Thompson*, 563 U.S. at 61; *see also Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008).

Merely showing that additional training would have been helpful or that the injury "could have been avoided" if the employee had better or more training is insufficient.  *Thompson*, 563 U.S. at 68.  Plaintiff must also show culpability; she must establish defendants' "conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."  *Id.* at 62 (quoting *Bryan Cty.*, 520 U.S. at 407).  Further, the causation prong will not be satisfied without a showing that the alleged training deficiency was the "moving force" behind the violation.  *Id.* at 59 n.5 (citing *City of Canton*, 489 U.S. at 389).  In other words, failure to train liability here requires a forceful showing of both culpability and causation.

27

In *City of Canton, Ohio v. Harris*, the Supreme Court explained that deliberate indifference in failure to train/supervise cases can be shown either by establishing that the need to train is so obvious *and* so likely to result in the violation of constitutional rights, or by showing a failure to act in response to repeated complaints of constitutional violations.  489 U.S. at 390, 390 n.10.  Again, Smith does not show that the failure to train was so obvious and so likely to result in the violation of her rights.  There is no evidence of a pattern of similar violations arising from a lack of training or supervision, and the "single-incident" exception is unavailable for the same reasons cited earlier.[55]  *See Brumfield*, 551 F.3d at 329; *Burge II*, 336 F.3d at 372.  Therefore, Smith has not shown deliberate indifference on this basis.

As to failure to act in the face of complaints of previous violations, this fails for the same reasons Smith's claim against Trabona in his individual capacity fails.  There is no evidence of repeated complaints of constitutional violations.[56]  Although there was a previous incident involving Carruth, there is no evidence that anyone associated with ACPD had knowledge of that incident before Smith was attacked.  Further, there is no evidence of previous violations by any ACPD officer, and *a fortiori* there is no evidence that

---

[55]    *See* p. 18, note 44, *supra*.

[56]    *See* pp. 17-18, *supra*.

28

anyone associated with ACPD had knowledge of those violations.  Finally, Smith submits no evidence even suggesting Trabona or ACPD had a reason to believe that previous violations occurred.

In response to the complete lack of evidence that defendants were aware of a pattern of violations, Smith responds that 1) the evidence does "not confirm" that Trabona and/or ACPD did not know about Carruth's attack on A.B.; 2) that *TPSO* pulled Carruth over while driving a vehicle that matched the victim's description days after A.B.'s attack; 3) that there is evidence that someone with ACPD told Carruth about a prostitute and therefore was aware that Carruth used prostitutes; and 4) that the Court should discount Trabona's affidavit and testimony because of alleged inconsistencies between the affidavit and Trabona's deposition.[57]  These arguments are unavailing.

First, defendants do not have the burden to prove that Trabona and ACPD were unaware of the attack on A.B.  As plaintiff, Smith bears the burden to demonstrate this knowledge, and defendants can meet their burden on summary judgment by merely pointing out that the evidence in the record is insufficient.  *See Celotex*, 477 U.S. at 325.  Smith must, *with*

---

[57]  R. Doc. 45 at 7-14.

*evidence*, set out specific facts showing a genuine dispute of fact exists. *Id.*
at 324. She has failed to do so.

Second, that TPSO pulled over Carruth days after the A.B. attack does
not create an issue of fact as to *ACPD*'s awareness. Former TPSO patrol
officer Christopher Sollie attests that after A.B. was attacked, TPSO sent out
a departmental message with the victim's description of her assailant and his
vehicle.[58] About two days later, Sollie stopped a vehicle that matched the
description.[59] Sollie identified the driver as Carruth, let Carruth go, and
reported the stop to his superior at TPSO.[60] But there is no evidence that
Sollie or anyone else at TPSO told ACPD about this stop. That TPSO, an
entity unaffiliated with ACPD, stopped Carruth in August is not evidence that
ACPD was aware of the stop. And given the lack of evidence to suggest that
Trabona or ACPD was aware of the stop or Carruth's attack on A.B., any
inference of knowledge based on the stop would be unreasonable.

Third, Smith argues that Carruth admitted to his arresting officers that
someone with ACPD told him about a prostitute, and therefore it can be
inferred that someone with ACPD knew Carruth consorted with prostitutes.[61]

---

[58]    R. Doc 45-2 at 220 ¶¶ 3-4.
[59]    *Id.* ¶ 6.
[60]    *Id.* at 221 ¶¶ 8-9.
[61]    R. Doc. 67 at 3; R. Doc. 67-1 at 7.

This argument fails because soliciting prostitutes is not sufficiently similar to rape and kidnapping. A pattern of violations requires more than "any and all bad or unwise acts[;]" the "prior acts [must] be fairly similar to what ultimately transpired." *Estate of Davis v. City of N. Richland Hill*, 406 F.3d 375, 383 (5th Cir. 2005) (citations omitted).

Finally, Trabona's affidavit and testimony are perfectly consistent in terms of Trabona's lack of knowledge regarding A.B. and Carruth, and his lack of knowledge that ACPD had any awareness about A.B. and Carruth. Therefore, Smith has failed to carry her burden in showing specific factual disputes as to the defendants' awareness of Carruth's past behavior.

In sum, Smith seeks to hold defendants liable for their failure to train and/or supervise Carruth, arguing that this was deliberate indifference to the obvious risk that Carruth would attack Smith. But there is no evidence suggesting that the defendants were aware of Carruth's attack on A.B., there is no evidence suggesting that defendants were aware of any previous complaints regarding a pattern of violations, and there is no evidence suggesting that anyone even complained about Carruth. Therefore, it cannot be said that defendants were indifferent to any risk, much less *deliberately* so. Without some showing that defendants chose to ignore an obvious risk, there is no deliberate indifference. *See Bryan Cty.*, 520 U.S. at 411; *Canton*,

31

489 U.S. at 389.  And as to supervision, there is no deliberate indifference because defendants had no knowledge, actual or constructive, of any reason for additional supervision.  *See Bryan Cty.*, 520 U.S. at 411-13.

Even if Smith could show deliberate indifference, she has failed to show that the failure to train or supervise was the moving force behind the violation of her rights.  Again, police officers should not need training to know not to rape, and it cannot be said that a lack of this training, without more, caused Carruth to rape Smith.   Therefore, Smith's failure to train/supervise claims fail.  *See Lewis*, 289 F. App'x at 771-73 (rejecting failure to train/supervise claim against police department after officer raped victim).

For the foregoing reasons, summary judgment in defendants' favor is warranted on all of Smith's section 1983 claims.

### C.    State Law Claims[62]

Defendants also move for summary judgment on Smith's Louisiana tort claims.   As to Trabona, Smith asserts claims of negligent hiring, negligent training, and negligent supervision.[63] She also seeks to hold

---

[62]      Because defendant Carruth did not move for summary judgment on Smith's federal claims, those claims remain, and the Court retains subject matter jurisdiction.

[63]      R. Doc. 28 at 7-8 ¶ 26.

defendants vicariously liable through *respondeat superior* for the torts committed by Carruth.[64]

### 1. State Law Immunity

Defendants first argue that Trabona has immunity under La. Stat. Ann. § 9:2798.1(B). This statute provides that "[l]iability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." *Id.* The immunity does not apply to "acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. Stat. Ann. § 9:2798.1(C)(2). Additionally, the Supreme Court of Louisiana has clarified that the immunity protects discretionary action when that discretion is grounded in social, economic, or political policy, and does not protect action taken at the operational level. *Fowler v. Roberts*, 556 So. 2d 1, 15 (La. 1989).

In determining whether the immunity applies, the Court must first determine if Trabona had a choice in how to act. *Id.* Smith argues that Trabona's "decisions and actions or omissions . . . were not discretionary,"

---

[64]   *Id.*

and therefore the immunity should not apply.[65]  But Smith's arguments have regularly been rejected, with both state and federal courts holding that the hiring, training, and supervision policies of Louisiana police entities are discretionary.  *See, e.g.*, *Smith v. Lafayette Parish Sheriff's Dept.*, 874 So. 2d 863, 868 (La. App. 3 Cir. 2004) ("Sheriff Breaux's hiring/retention policy was a discretionary act."); *Hoffpauir v. Columbia Cas. Co.*, No. 12-403, 2013 WL 5934699, at *12 (M.D. La. Nov. 5, 2013) (finding that "the hiring, training, and supervision policy of the . . . Sheriff's Department is a discretionary function"); *City of Shreveport*, 397 F.3d at 296 (finding hiring, training, and supervisory policies of police chief to be discretionary).  Smith points to La. Stat. Ann. § 40:2401, which mandates training for peace officers, but this statute does not require any *specific* training, and it leaves the choice of training to the discretion of law enforcement.  *See Romain v. Governor's Office of Homeland Sec.,* No. 14-660, 2016 WL 3982329, at *13-14 (M.D. La. July 22, 2016) (rejecting same argument based on La. Stat. Ann. § 40.2401).

Because Smith points to no statute mandating a policy or procedure as to ACPD's hiring, training or supervision, the functions are discretionary and

---

[65]    R. Doc. 45 at 15.

La. Stat. Ann. § 9:2798.1 affords Trabona and Amite City immunity.[66]  Smith does not argue that any action by Trabona was "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." Thus, La. Stat. Ann. § 9:2798.1(C) does not apply.   Therefore, summary judgment on plaintiff's state law negligence and negligent hiring, supervision and training claims against defendants is granted.

### 2. Vicarious Liability for Carruth's Torts

Defendants additionally move for summary judgment on Smith's claims asserting that defendants should be liable for Carruth's torts based on *respondeat superior*.   Discretionary immunity does not apply to vicarious liability, and defendants do not argue that it does.  *See Hoffpauir*, 2013 WL 5934699, at *13.

Under Louisiana Civil Code article 2320, an employer is liable for the torts committed by its employees if, at the time, the employee was acting within the course and scope of his employment.  La. Civ. Code art. 2320; *Baumeister v. Plunkett*, 673 So. 2d 994, 996 (La. 1996).  In *Lebrane v. Lewis*, the Louisiana Supreme Court articulated four factors in considering whether

---

[66]    Defendants do not explicitly argue that the immunity applies to Smith's claims against Amite City as well, but the plain language of the statute indicates that Amite City is immune as well.  La. Stat. Ann. § 9:2798.1(A).

an employer should be held vicariously liable for the torts of its employees: (1) whether the tortious act was primarily employment rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment.  292 So. 2d 216, 218 (La. 1974).  No single factor is dispositive, and liability can be found even if some of the factors are not met.  *Plunkett*, 673 So. 2d at 997.  The focus of the inquiry is determining "whether the employee's tortious conduct was 'so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business,'" as compared to "'conduct motivated by purely personal considerations entirely extraneous to the employer's interests.'"  *Smith*, 874 So. 2d at 866 (quoting *Lebrane*, 292 So. 2d at 218).  The "scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the [employee] in performing" his work.  *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 477 (La. 1990).

The question of course and scope of employment is a mixed question of law and fact.  *Russell v. Noullet*, 721 So. 2d 868, 871 (La. 1998); *Bates v. Caruso*, 881 So. 2d 758, 761 (La. App. 4 Cir. 2004).  Each case must be decided on its specific facts.  *Id.* at 762.  Generally, an employee's actions are

36

within the course and scope of his employment if "the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." *Orgeron v. McDonald*, 639 So. 2d 224, 226-27 (La. 1994). That the primary motive of the employee is to benefit himself does not prevent the tortious act of the employee from falling within the scope of his employment. *Ermert*, 559 So. 2d at 477. If the purpose of serving the employer's business actuates the employee to any appreciable extent, the employer is liable. *Richard v. Hall*, 874 So. 2d 131, 137-38 (La. 2004).

In police cases, Louisiana courts give special weight to the considerable public trust and authority wielded by police officers in performing the vicarious liability analysis. *See Doe v. Morris*, No. 11-1532, 2013 WL 3933928, at *4 (E.D. La. July 30, 2013) (citing *Applewhite v. City of Baton Rouge*, 380 So. 2d 119 (La. App. 1 Cir. 1979)). In *Applewhite*, the court held the City of Baton Rouge vicariously liable for a police officer's rape of a woman while he was performing duties for the city. The plaintiff in that case was walking along the highway with companions when a uniformed officer ordered her into his police car to be taken to jail for vagrancy. *Id.* at 120. The officer then parked his car and forced the plaintiff to engage in sex. *Id.* In a civil suit brought by the victim, the City of Baton Rouge maintained that the

37

officer's actions were far removed from the course and scope of his employment. The court found otherwise, emphasizing that the officer "was on duty in uniform and armed, and was operating a police unit at the time of this incident." *Id.* The court found significant that the officer "was able to separate the plaintiff from her companions because of the force and authority of the position which he held." *Id.* The court reviewed Louisiana case law in the police context and concluded that it consistently held employers responsible for transgressive police behavior even if the conduct was not squarely within the officer's usual duties. *Id.* (citing *Cheatham v. Lee*, 277 So. 2d 513 (La. App. 1 Cir. 1973) (holding City of Baton Rouge vicariously liable for battery committed by police officer who was in uniform and armed but off duty chaperoning private party outside of city limits); *Bourque v. Lohr*, 248 So. 2d 901 (La. App. 1 Cir. 1971) (insurer of City of New Iberia cast in judgment for certain torts committed by an off-duty, uniformed police officer while using his private vehicle)). The *Applewhite* court summarized the position of the Louisiana courts by stating, "[i]n short, . . . where it is found that a law enforcement officer has abused the 'apparent authority' given such persons to act in the public interest, their employers have been required to respond in damages." 380 So. 2d at 122. These cases make clear that officers' duty status is not determinative of the vicarious liability inquiry.

Post-*Applewhite*, Louisiana courts have continued to focus on abuse of authority in determining vicarious liability for employees in positions of power.  In *Latullas v. State*, 658 So. 2d 800 (La. App. 1 Cir. 1995), the Louisiana First Circuit Court of Appeal held the State of Louisiana liable for a prison guard's rape of a prisoner on prison grounds while the guard was in charge of a prisoner work crew.  The court reasoned that the guard was able to separate the plaintiff from others and commit the rape because of the authority bestowed upon him by his employer.  658 So. 2d at 804. The court acknowledged that the rape was "totally unauthorized . . . and motivated by . . . personal desires." *Id.*  The court nevertheless found vicarious liability because the rape occurred while the guard was "acting for his employer in the control and supervision of inmates, and it was through these duties that this opportunity arose." *Id.* at 804-05.

In a similar vein is *Turner v. State*, 494 So. 2d 1292 (La. App. 2 Cir. 1986).  There, a recruiting officer for the Louisiana National Guard induced four women to believe that he had the authority to conduct physical exams, during which he touched them inappropriately, while interviewing them for induction into the National Guard. *Id.* at 1296. The court found the State vicariously liable for the recruiting officer's acts because the incident was

made possible by the apparent authority of the position the officer held with his employer. *Id.*

Louisiana Courts have focused on apparent authority in non-law enforcement cases as well. In *Dismuke v. Quaynor*, 637 So. 2d 555 (La. App. 2 Cir. 1994), *writ denied*, 639 So. 2d 1164 (La. 1994), the court affirmed the finding that Grambling University was vicariously liable for a rape committed by one of its employees acting as a camp counselor. 637 So. 2d at 562. In doing so, the Court noted that though the employee was "technically off duty," the employee used and abused the supervisory authority conferred on him by the university to get in close proximity with the victim and observe her until she was alone. *Id.* at 561-562. *See also Harrington v. Louisiana State Bd. of Elementary & Secondary Educ.*, 714 So. 2d 845, 851-52 (La. App. 4 Cir. 1998), *writ denied sub nom. Harrington v. Veller*, 728 So. 2d 1287 (La. 1998) (finding state vicariously liable for rape of student in part because the employee "abused his position of authority when he raped [the victim]").

Although the Louisiana Supreme Court has found no vicarious liability in two police officer cases, the Court has not confronted the issue in the context presented here. In *Brasseaux v. Town of Mamou*, the Louisiana Supreme Court found no vicarious liability for an off-duty officer's assault. 752 So. 2d 815, 821-23 (La. 2000). There, the officer was drinking at a bar

when his friend started a fight. The officer showed his badge only to protect his friend and himself.  Unlike here, there was no finding that the officer in *Brasseaux* used his position as a police officer to stage the assault, or that the officer otherwise abused his authority to create the situation that led to the harm.  Further, *Brasseaux* involved a part-time dispatcher who never performed (except on one day) the usual duties of police officers like patrolling and making arrests, and the *Brasseaux* court did not clearly delineate whether it treated the employee as a police officer or a municipal employee with less discretion.  *Id.* at 821 ("However, we need not address that particular finding at this time, for whether his classification is that of a part-time time dispatcher or a police officer, it is certain that [defendant] was an *employee* of the Town of Mamou Police Department."); *see also id.* at 824 ("I therefore conclude that [defendant], at the time of the attack, was not a police officer.") (Lemmon, J., concurring).  *See also Russell*, 781 So. 2d. 868 (finding no vicarious liability when off-duty officer became caught up in a brawl at a private gathering).

In this case, on the other hand, Smith testified that Carruth staged the kidnapping and rape by using the authority and accoutrements of his position as a police officer.  She said that Carruth identified himself as an officer, displayed his badge, placed her under arrest, handcuffed her, read

her her rights, and threatened jail and charges.[67]   Although defendants contend that Carruth did not "use his authority or police power" to carry out his attack on Smith,[68]   the Court finds that plaintiff's evidence at least raises a genuine dispute of material fact that Carruth used and abused the apparent authority granted by his position as a police officer to kidnap and rape Smith. And, the authority to make arrests is an integral police function that imbues the officer with a public trust.   At the same time, this tremendous power carries the concomitant risk of abuse.   That risk, in a context where an officer uses the power and authority of his position as a police officer to isolate and subdue a victim, is a risk of harm that a jury could find attributable to the officer's employer, which cloaked him with that apparent authority.   *See Sampson v. City of New Orleans*, No. 04-1052, 2005 WL 14908, at *3 (E.D. La. Jan. 3, 2005).

---

[67]     R. Doc. 45-2 at 3-4; R. Doc. 40-10 at 11-13.
[68]     R. Doc. 40-1 at 15.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment for defendants on all of Smith's federal claims and on Smith's state law negligence claims.  The Court DENIES summary judgment on Smith's claims that defendants are vicariously liable for Carruth's torts under state law.


New Orleans, Louisiana, this ___1st___ day of March, 2017.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE